# RESTATED OPERATING AGREEMENT

## OF

## PHILLIPS FAMILY ENTERPRISES, LLC
(an Ohio Limited Liability Company)

EXHIBIT B

## RESTATED OPERATING AGREEMENT
## OF
## PHILLIPS FAMILY ENTERPRISES, LLC
### (an Ohio Limited Liability Company)

THIS IS THE RESTATED OPERATING AGREEMENT of Phillips Family Enterprises, LLC, an Ohio limited liability company (the "Company"), by which Kara L. Phillips, TTEE of The Kara Phillips Revocable Trust, dated January 23, 2018, (K. Phillips, TTEE) an individual, Paxton Phillips, (P. Phillips) an individual, Kyler Phillips, (K. Phillips) an individual, Ever Phillips, (E. Phillips) an individual, and Onyx Phillips, (O. Phillips) an individual, are the initial Members, in consideration of the capital contributions to the Company and mutual promises in this Agreement (the receipt, mutuality, adequacy and sufficiency of which are hereby acknowledged), hereby agree as follows:

1. **General**.

    (a) **Formation and Term**. The Company was formed on June 21st, 2004 by the filing of Articles of Organization with the Ohio Secretary of State (Document ID #200417301598) pursuant to the Ohio Revised Code, O.R.C. § 1702 et seq. (as amended from time to time, the "ORC"). The Company will have perpetual duration until dissolved in accordance with this Agreement or the ORC.

    (b) **Applicability of the ORC**. To the extent that a Member's rights and obligations and the administration, dissolution, liquidation and termination of the Company are not set forth in this Agreement, such will be governed by the ORC. To the extent that this Agreement contains a provision contrary to an ORC provision, such ORC provision is overridden by such contrary provision in this Agreement.

    (c) **Purpose**. The Company may engage in the business (the "Business"), of any lawful activity.

    (d) **No Personal Liability of Members**. No Member, Officer, employee or agent will have any personal liability to any third party for any debt, obligation, liability or loss of the Company, all as provided in, and subject to, the ORC.

    (e) **Limitations**. The relationship between and among the parties is limited to the carrying on of the Company's business in accordance with this Agreement. The Members intend that the Company will not be a partnership or joint venture, and that no Member will be a partner or joint venturer of any other Member for any purposes other than under the Internal Revenue Code of 1986, as amended from time to time (the "IRC"), and comparable state tax laws.

    (f) **Waiver of Rights**. Each Member hereby expressly waives, on behalf of itself and its successors and assigns, any and all rights to dissolve, terminate or liquidate, or to petition a court for the partition, dissolution, termination or liquidation of the Company, except as provided in Section 11(a).

Initials

2. **Members**.

   (a) <u>Generally</u>. The term "<u>Member</u>" means a person who either (i) signs this Agreement or (ii) is admitted in accordance with this Section 2, in either case until he ceases to be a Member in accordance with Section 2(f).

   (b) <u>Initial Members</u>. The initial Members are K. Phillips, TTEE, P. Phillips, K. Phillips, E. Phillips and O. Phillips.

   (c) <u>Admission of a New Member</u>. A person may become a Member only as follows:

      (i) either (A) by the issuance by the Company of Units, or (B) as a Transferee of a Member's limited liability company interest and his rights as a member of the Company (collectively, a "<u>Membership Interest</u>"), or any portion it, in each case subject to other applicable provisions of this Agreement; and

      (ii) the execution of this Agreement or an agreement in form, scope and substance acceptable to the Members in their reasonable discretion, pursuant to which such person agrees to be a "Member" for purposes of, and otherwise bound by, this Agreement.

   No new Member will be entitled to any retroactive allocation of gains, losses, income or expense deductions incurred by the Company. The Members may, at the request of Members who collectively own a majority of the Company's Units (a "<u>Majority Interest</u>"), and at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of gain, loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with IRC § 706(d).

   (d) <u>Limited Right to Withdraw</u>. No Member may withdraw or resign except with the consent of all the Members (which consent may be withheld for any reason or for no reason). The amount, if any, of any distribution that a withdrawing Member is entitled to receive upon withdrawal will be determined by the Members who collectively own a majority of the Units other than the Units owned by the withdrawing Member.

   (e) <u>No Removal</u>. No Member may be removed as a Member except pursuant to a purchase of that Member's Membership Interest either agreed to by that Member, expressly required by Section 10, or otherwise expressly permitted by this Agreement.

   (f) <u>Cessation of Membership</u>. A Member will cease to be a Member only (i) upon his resignation if consented to pursuant to Section 2(d), (ii) upon his removal in accordance with Section 2(e), or (iii) upon the transfer of his interest if permitted by Section 9. Those provisions of the ORC that specify other events in which one ceases to be Member are hereby overridden.

_K Par KP Ever Py R_
Initials

3.  **Capital Structure.**

    (a)  Capital Contributions. Each initial Member's initial capital contribution to the Company was deposited into the Company operating account at the time of organization. The current capital account for each initial member is memorialized in the Company financials.

    No interest will accrue, or be paid, on any capital contribution to the Company. Except for the initial capital contributions, no Member shall be required to make any additional capital contributions to the Company.

    (b)  Percentage Interests. Each Member's percentage interest in the Company (each, a "Percentage Interest") at any given time shall equal a fraction, the numerator of which is the number of Units held by such Member at such time and the denominator of which is the total number of Units issued and outstanding at such time. The Percentage Interests of the initial Members as of the date of this Agreement are as follows:

    K. Phillips, TTEE (with TOD designation of such units to Paul A. Phillips, husband)    51%

    P. Phillips (with TOD designation of such units to Kara L. Phillips, TTEE, mother)    12.25%

    K. Phillips (with TOD designation of such units to Kara L. Phillips, TTEE, mother)    12.25%

    E. Phillips (with TOD designation of such units to Kara L. Phillips, TTEE, mother)    12.25%

    O. Phillips (with TOD designation of such units to Kara L. Phillips, TTEE, mother)    12.25%

The Percentage Interests will change only (i) by amendment to this Agreement, (ii) by an assignment/transfer of an interest in the Company permitted by this Agreement, (iii) by the issuance of additional Units in accordance with the terms of this Agreement or (iv) by the Company's purchase of Units pursuant to Section 9 or 10. Such changes will be effective upon the effective date of the amendment, assignment, issuance or purchase. The percentages set forth above, as so changed, will apply in all circumstances where relevant to determining the extent of the Member's Membership Interest in the Company, including its rights to profits and losses, right to vote on, consent to or otherwise participate in any decision or action to be taken by the Members under this Agreement or the ORC.

    (c)  Units. Each Member's Membership Interest may be quantified and expressed in terms of the unit of measure "Units". K. Phillips, TTEE owns 51 Units, P. Phillips owns 12.25 Units, K. Phillips owns 12.25 Units, E. Phillips owns 12.25 Units and O. Phillips owns 12.25 Units on the date of this Agreement. Certificates representing Units signed by the President or other officer of the Company may be issued to each Member certifying the number of Units owned by such Member and bearing such legends as the Members may determine.

    (d)  No Withdrawals of Capital. No Member will have the right to withdraw, or to be repaid, any capital contributed by such Member. The foregoing sentence does not limit in any manner whatsoever payments in dissolution or for purchase of Units from a Member in accordance with this Agreement.

Page 4 of 18

Initials

(e) <u>Allocations and Distributions; Expense Reimbursement</u>. The Company's net cash flow and tax profits and losses will be allocated among the Members in accordance with the Percentage Interests. The Company will (i) reimburse the Members for their reasonable and necessary business costs and expenses incurred on behalf of the Company in the execution of the Business, including the costs and expenses incurred in connection with the preparation of this Agreement, and (ii) make distributions to the Members to enable them to pay federal, state and local income taxes attributable to their Units, which distributions will be made to each Member in an amount equal to the Members' Percentage Interest multiplied by the Company's taxable income for the period multiplied by the highest marginal combined federal and Ohio state income tax rate for individuals (determined after giving effect to the deduction of state income taxes for federal income tax purposes) as applicable at the time. In addition, to the extent net cash flow is available, the Company will make other distributions to the Members at such times and in such forms and amounts as the Members may determine.

(f) <u>Capital Accounts</u>.

(i) <u>Generally</u>. An individual capital account (a "Capital Account") shall be established and maintained for each Member. The initial Capital Account balance of each initial Member shall be the amount of such Member's aggregate initial capital contribution specified in Section 3(a). No Member shall be liable, either before or upon termination of the Company, to the Company for its negative Capital Account balance, if any, except to the extent that such negative balance arose as a result of such Member's receipt of a distribution in excess of the amount rightfully due it pursuant to this Agreement. Upon a Transfer of all or part of a Member's Units in accordance with the terms of this Agreement, the Capital Account of the Transferring Member attributable to the Transferred Units shall carry over to the Transferee thereof.

(ii) <u>Maintenance</u>. The Capital Account of each Member shall be maintained in accordance with IRC § 704 and applicable regulations promulgated pursuant thereto and, to the extent not inconsistent therewith, the provisions of this Section 3(f). Each Member's Capital Account shall be credited with capital contributions made in respect of the interest of such Member and with items of income and gain allocated to such interests and shall be charged with distributions made in respect of such interest and with items of loss and deduction allocated to such interest. Except to the extent otherwise provided in this Agreement, each Capital Account shall be computed, as of any particular time, by reference to contributions and distributions having occurred prior to such time, and by reference to allocations of items of income, gain, loss and deduction with respect to accounting periods that have ended prior to such time, except that if such time shall be during the winding up of the Company, or following the sale of all or substantially all of the Company's assets, reference shall be made to all items of income, gain, loss and deduction accountable up to such time. The Officers, acting at the direction of a Majority Interest, shall have the authority to make appropriate adjustments to the allocations of items pursuant to this Section 3(f) if necessary in order to comply with IRC § 704 or the applicable regulations; <u>provided</u>, <u>however</u>, that no such adjustment shall have a material adverse effect upon the amount distributable to any Member.

(g) <u>Books and Records</u>. The Members will cause the Company: (i) to keep such books and records as are required by applicable law, and (ii) to maintain such other books and records as the Members may from time to time decide.

_____
Initials

(h) <u>Fiscal Year; Method of Accounting</u>. The Company's books will be kept on the basis of a December 31 fiscal year (the "<u>Fiscal Year</u>") using the cash method of accounting and will be closed and balanced at the end of each Fiscal Year.

(i) <u>Reports to Members</u>. The Members will cause the Company to distribute to the Members such reports and on such frequency as the Members may determine.

(j) <u>Bank Accounts</u>. The Members will cause the Company to maintain such bank accounts for Company funds as the Members deems necessary or appropriate.

(k) <u>Matters Concerning Taxes</u>.

(i) <u>Tax Elections</u>. All tax elections made by or for the Company will be approved by a Majority Interest.

(ii) <u>Tax Matters Partner</u>. For purposes of IRC §§ 6221 through 6234, K. Phillips, TTEE is the "<u>tax matters partner</u>" of the Company.

4. **Distributions and Allocations.**

(a) <u>Distributions of Net Cash Flow</u>. The Company's net cash flow (and any other assets) will be distributed to the Members in accordance with their respective Percentage Interests as the Members from time-to-time determine by a majority vote in their reasonable discretion.

(b) <u>Allocation of Tax Profits and Losses</u>. The Company's tax profits and tax losses will be allocated among the Members in accordance with their Percentage Interests.

5. **Management by K. Phillips, TTEE.**

(a) <u>Management by Managing Member.</u> The management and control of the business and affairs of the Company will be vested solely in K. Phillips, TTEE (the "Managing Member").

(b) <u>Powers of Members</u>.

(i) Subject to Section 5(b)(ii), the Managing Member has the full power and authority to manage the business and affairs of the Company in accordance with the ORC, including the power to purchase, sell and lease property of any kind, to incur indebtedness and give security for such, to guarantee obligations of others, to execute contracts and instruments on behalf of the Company, and to take all such actions as may be necessary to carry out any actions, either directly or through the Company's Officers, employees, agents and other delegees.

(ii) Notwithstanding anything contained in Section 5(b)(i) to the contrary, the Managing Member shall not have the power or authority in his capacity as a Managing Member to take any of the following actions on behalf of the Company without the consent of Members who collectively own **two-thirds (2/3)** of the Units (a "**Supermajority Interest**"):

Page 6 of 18

_____
Initials

(A) any incurrence, renewal, extension, refinancing, prepayment of any indebtedness of the Company, or amendment of the terms thereof, other than trade payables incurred in the ordinary course of business;

(B) any grant of any mortgage, deed of trust, security deed, security interest or other lien on any of the Company's assets;

(C) any distribution or payment of cash or other assets to a Member, other than (1) pursuant to Section 4(a) or (2) payments for reimbursement of reasonable and necessary business expenses pursuant to Section 3(e) (i), if such expenses have been previously approved by the Managing Member;

(D) any entry into any contract or transaction with a Member or an affiliate of a Member, other than as contemplated by this Agreement, including any engagement of a Member to perform services on behalf of the Company, and any determination of the compensation for any such services;

(E) (1) any making of an assignment for the benefit of creditors; (2) any filing of a voluntary petition in bankruptcy; (3) any filing of a petition or answer seeking for the Company any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; (4) any filing of any answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Company and any proceeding of a nature described in this Section 5(b)(ii); or (5) any pursuit of, consent to, or acquiescence in the appointment of a trustee, receiver, or liquidator of the Company of all or any substantial part of the Company's properties;

(F) any commencement of a lawsuit or arbitration proceeding in which the amount in controversy, together with the anticipated or incurred expenses, including attorney's fees and costs exceeds $10,000.00 (other than collection suits and actions related thereto commenced in the ordinary course of business);

(G) any entry into a material contract binding the Company, where "material contract" means a contract or commitment that involves a term of one year or more or payments or receipts expected to exceed $25,000.00; and

(H) any purchase or lease of any real property, or purchase or lease any personal property having a purchase price or fair market value in excess of $25,000.00.

(c) Meetings of Members. The following provisions apply to meetings of the Members:

(i) Annual Meetings. No annual meeting of the Members is required, but the Members may call such meeting for the transaction of such business as may properly come before the meeting. Any such annual meeting will be held on such date, at such

Initials

time and at such place as the Members specify in the notice of the meeting, which will be delivered to each Member at least fourteen (14) days prior to such meeting. Neither the business to be transacted at, nor the purpose of, such annual meeting need be specified in the notice.

(ii) <u>Special Meetings</u>. Special meetings of the Members may be called by any Member. Any such meeting will be held on such date, at such time and at such place as the Member calling such meeting specifies in the notice of the meeting, which will be delivered to each Member at least ten (10) days prior to such meeting. The business to be transacted at, and the purpose of, such special meeting shall be specified in the notice.

(iii) <u>Place of Meeting</u>. Any such meeting will be held at the principal place of business of the Company, unless the notice of such meeting specifies a different place, which need not be in the State of Ohio, but shall be reasonable as to location and time of said meeting.

(iv) <u>Notice</u>. Each notice of a meeting will be in writing and given either (A) in person, (B) by a nationally recognized next business day delivery service for next business day delivery, (C) by fax, or (D) by electronic mail, and in the case of clauses (B), (C) and (D), to the last known business address/number of the recipient.

(v) <u>Quorum</u>. At any meeting of the Members, a **Majority Interest**, represented either in person or by proxy, will constitute a quorum for the transaction of business, and an act of the Members owning a majority of the Units so represented will be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by this Agreement.

(vi) <u>Voting</u>. Except as otherwise required by law, all resolutions adopted and business transacted by the Members shall require the favorable vote of the holders of a **majority of the Units represented at the meeting** and entitled to vote on the subject matter. Except as otherwise required by law, at any meeting of the Members, each Member entitled to vote shall have one vote, in person or by proxy, for each Unit having voting rights standing in its name on the books of the Company at the record date fixed or otherwise determined for such meeting.

(vii) <u>Interested Members</u>. **Members who have an interest** (economic or otherwise) in the outcome of any particular matter upon which the Members vote or consent **may vote or consent** upon any such matter, and their Units, vote or consent, as applicable, will be counted in the determination of whether the requisite matter was approved by the Members.

(viii) <u>Waiver of Notice – Generally</u>. The right to receive notice, or to receive notice at a particular time or in a particular manner, may be waived in writing by the person entitled to receive such notice.

(ix) <u>Waiver of Notice – Through Attendance</u>. Attendance of a person at a meeting of the Members (including attendance pursuant to Section 5(c) (xi)) will constitute a waiver of notice of such meeting, except where such Member attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

Page 8 of 18

Initials

(x) <u>Action by Written Consent</u>. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Members having not fewer than the minimum number of Units or votes that would be necessary to take the action at a meeting at which all Members entitled to vote on the action were present and voted. Notice of any such consent will be given to any non-signing Member in accordance with the ORC.

(xi) <u>Meetings by Telephone</u>. Members may participate in and hold a meeting by means of conference telephone, video conference, or similar communications equipment by means of which all persons participating in the meeting can hear each other.

(d) <u>Minutes and Other Records</u>. The Members may keep minutes of their meetings. Such minutes, together with copies of written consents and notices and other instruments under this Agreement, may be maintained in the Company's records.

(e) <u>Reliance</u>. Each of the Members hereby expressly acknowledges and agrees: (i) that the Members are authorized to act notwithstanding any dispute or disagreement among the Members if such act is otherwise in accordance with this Agreement; and (ii) that any other person is entitled to rely on any and all actions taken (or not taken) by the Members or with respect to this Agreement that appear to have been taken in accordance with this Agreement without any duty of inquiry as to the genuineness of the writing or other communication and without any obligation of inquiry of any of the Members.

(f) <u>Decisions Requiring **Supermajority** Member Consent</u>. Notwithstanding any power or authority granted the Members under the ORC, the Articles of Organization or this Agreement, the Members may **not** make or take any of the following decisions or actions without first obtaining the written consent of a Supermajority Interest:

(i) admission of a new Member;

(ii) the merger of the Company, or the sale, exchange, lease, or other disposition of all or substantially all of the property of the Company;

(iii) the amendment of the Articles of Organization or this Agreement;

(iv) the issuance of any Units or other equity interests in the Company, and the establishment of the consideration payable for them; or

(v) the **redemption by the Company of all or a portion of any Member's Units** or other equity interests in the Company, other than as provided in Section 10.

6. **Officers**. The Members may appoint one or more individuals to act as officers of the Company ("<u>Officers</u>") on behalf of the Company. Any number of offices may be held by the same person. The initial Officers are as follows:

President           K. Phillips, TTEE

Page 9 of 18             _____
                             Initials

Each Officer will hold office until his death, resignation or removal. The Members may at any time and from time to time remove and replace, and otherwise fill a vacancy as to, any Officer. Absent a contrary delegation of powers by the Members, and to the extent not inconsistent with the exercise by such person of his powers in his role as a Member pursuant to Section 5(b) (ii) of this Agreement, each Officer will have such power and authority as are customarily delegated to persons holding equivalent titles in a corporation incorporated pursuant to Ohio law.

7. **Duties of Members and Officers; Standard of Care.**

(a) Generally. A Member and each Officer, in managing the business or affairs of the Company, will discharge his duties: (i) in a manner he believes in good faith to be in the best interests of the Company (but the foregoing is not violated solely because a Member's or Officer's conduct furthers the interest of the Member); (ii) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; (iii) in good faith reliance on the provisions of this Agreement; (iv) without intentional misconduct or a knowing violation of law; and (v) without engaging in any transaction for which he receives a personal benefit in violation or breach of any provision of this Agreement. No Officer has any other duty to the Company or any Member.

(b) No Duty of Members. No Member has any duty to the Company or any Member solely by reason of acting in its capacity as a Member except a set forth in Section 7(a). Subject to Section 7(a), (i) a Member does not violate any duty or obligation under this Agreement or under law solely because the Member's conduct furthers its interest, and (ii) a Member has no duty or obligation to consider any interest of or affecting the Company or any other person.

8. **Exculpation and Indemnification.**

(a) Exculpation. No Member or Officer will be liable to the Company or any Member for any act or omission except (i) for any act or omission that constitutes bad faith, (ii) for any intentional misconduct or knowing violation of law, or (iii) for any transaction for which the Member or Officer received a personal benefit in violation or breach of any provision of this Agreement.

(b) Indemnification. The Company will indemnify, defend and hold harmless each Member and Officer in his or its capacity as such to the fullest extent permitted under the ORC and applicable law. Without limiting the foregoing, the Company:

(i) will indemnify, defend and hold each Member and Officer harmless in connection with the management of the Company or any entity in which the Company has an interest (each Member and Officer, a "Company Indemnified Person"); and

(ii) will pay to the Company Indemnified Person the amount of any damages incurred by the Company Indemnified Person in connection with any claim in which any Company Indemnified Person may be involved, or with which he may be threatened, while a Member or while serving in the capacity of an Officer or thereafter by reason of his having been a Member or having served as an Officer; provided, however, that the foregoing obligations will not apply to the extent that the act or omission of the Company Indemnified Person involved either (A) any act or omission that constitutes bad faith, (B) intentional misconduct or a knowing

Initials

violation of law, or (C) any transaction for which the Member or Officer received a personal benefit in violation or breach of any provision of this Agreement.

(c) <u>Defense Counsel</u>. The Company will have the right (i) to approve any counsel selected by any Company Indemnified Person and (ii) to approve the terms of any proposed settlement. Such approval will not be unreasonably withheld, conditioned or delayed.

(d) <u>Expenses</u>. The Company will advance to any Company Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any such proceeding if the Company Indemnified Person agrees in writing before any such advancement that he will reimburse the Company for such fees, costs and expenses to the extent that it is determined by a final, non-appealable decision of a court of competent jurisdiction that he was not entitled to indemnification under this Section 8.

(e) <u>Non-Exclusive</u>. The rights accruing to each Company Indemnified Person under this Section will not exclude any other right to which he may be lawfully entitled.

(f) <u>Subsequent Amendment</u>. If the ORC is hereafter amended to eliminate or limit the personal liability of members or officers, then the liability of a Member or Officer shall be eliminated or limited to the fullest extent permitted by the ORC, as so amended. No amendment, termination or other elimination of this Section 8 or of any relevant provisions of the ORC or of any other applicable law shall affect or diminish in any way the rights to indemnification under this Section 8 with respect to any action, suit or proceeding arising out of, or relating to, any event or act or omission occurring, or fact or circumstance existing, prior to such amendment, termination or other elimination.

(g) <u>Continuation of Right to Indemnification</u>. All rights to indemnification under this Section 8 shall continue as to a person who has ceased to be a Member or Officer, shall inure to the benefit of the heirs, executors, administrators, successors, assigns and the estate of any such person, and shall be deemed to be a contract between the Company and each such person. This Section 8 shall be binding upon any successor to the Company, whether by way of merger, consolidation, liquidation, dissolution or otherwise.

(h) <u>Savings Clause</u>. If this Section 8 or any portion of it shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify persons specified in this Section 8 to the full extent permitted by any applicable portion of this Section 8 that shall not have been invalidated and to the full extent permitted by applicable law.

9. **Restrictions on Transfers.**

(a) <u>Generally</u>. Subject to the provisions of Section 10 hereof,

(i) Any Member may sell, transfer, assign, convey, exchange, pledge, hypothecate, gift or otherwise dispose of (collectively, "<u>Transfer</u>", the Member making a Transfer is a "<u>Transferor</u>" and the recipient of the Transfer is a "<u>Transferee</u>") its Units only pursuant to Section 10, herein. **Each Initial Member specifically acknowledges that this Agreement, including this Section 9. and the below Section 10., affects themselves, heirs, and/or lineal descendants and supersedes each Member's legacy/estate planning, including**

Page 11 of 18

Initials

any lineal descendants' rights of inheritance per the statutes of decent and distribution, spouse's dower rights in any real estate, etc.

(ii) If any Member (the "Selling Member") desires to Transfer all or any portion of its Units (the "Offered Units") to a person, such Selling Member must first obtain a **bona fide written offer** (the "Offer") from the intended purchaser that will be open for at least **One-Hundred Twenty (120) days**. After receipt of such Offer, the Selling Member shall deliver a notice (an "Offer Notice") to the Company and the other Members setting forth the details of the Offer, including the amount of the Offered Units, the purchase price, the estimated expenses associated with the Transfer, a description of all the other material terms and conditions of the proposed Transfer and, in the case of a Transfer in which the consideration payable for the Offered Units consists in whole or in part of consideration other than cash, a description of the non-cash component of the consideration, together with the Selling Member's reasonable estimate of the fair market value of such non-cash component. The Offer Notice shall also contain a true and correct copy of the Offer/proposed Purchase Agreement.

(iii) The Company shall have the right, for a period of **sixty (60) days** (the "Company Purchase Period") after receipt of an Offer Notice, to elect, by delivering written notice to the Selling Member, to purchase all of the Offered Units at the price set forth in the Offer Notice, and on other terms and conditions that are substantially the same as the other material terms set forth in the Offer Notice. If the Company elects to purchase the Offered Units, the closing of the sale of the Offered Units shall take place thirty (30) calendar days after expiration of the Company Purchase Period, or at such other time as the interested parties may agree, and on substantially the terms and conditions specified in the Offer Notice/Purchase Agreement. The Company will deliver to each Member prior to the end of the Company Purchase Period a written notice of its election to purchase, or not to purchase, the Offered Units.

(iv) If the Company notifies the Members that it elects not to purchase the Offered Units, then each Member that received an Offer Notice/Purchase Agreement (an "Offeree Member") shall have the right, for a period of **sixty (60) days** (the "Member Purchase Period") after its receipt of the Company's written notice pursuant to Section 9(a)(iii), to elect, by delivering written notice to the Selling Member, to purchase all of the Offered Units at the price set forth in the Offer Notice, and on other terms and conditions that are substantially the same as the other material terms set forth in the Offer Notice/Purchase Agreement. If more than one Offeree Member elects to purchase the Offered Units, then each such Offeree Members shall have the right to acquire, and shall acquire, from the Selling Member its proportionate share of the Offered Units by paying to such other person its proportionate share of purchase price specified in the Offer Notice/Purchase Agreement. For purposes of the preceding sentence, the proportionate share of an electing Offeree Member shall be determined by a fraction, the numerator of which is the Percentage Interest of such electing Offeree Member and the denominator of which is the sum of the Percentage Interests of all of the electing Offeree Members. The closing of the sale of any Offered Units pursuant to this Section 9(a)(iv) shall take place thirty (30) calendar days after expiration of the Member Purchase Period, or at such other time as the interested parties may agree, and on the substantially the terms and conditions specified in the Offer Notice.

(v) Any Transfer of a Unit shall be made only in compliance with all applicable securities laws and the Company may require the Transferor to obtain and deliver to the Company (A) an opinion of counsel (reasonably acceptable, as to the form and substance

Initials

of the opinion and as to the counsel, to the Company), and (B) representations of the Transferee to demonstrate that such proposed transfer so complies.

(b) Other. Any Transfer permitted in accordance with Section 9(a) will not effect a termination or dissolution of the Company, and the Transferee of such Transfer will succeed to the rights of the Transferring Member, according to the terms of this Agreement. **EXCEPT AS SPECIFIED IN SECTION 10, ANY TRANSFER IN VIOLATION OF THE FOREGOING IS NULL AND VOID AND OF NO FORCE AND EFFECT.** Without limiting the foregoing, no Transferee who receives Units in a transaction that does not comply with Section 9(a) will (i) be a Member, (ii) be entitled to share in the Company's profits and losses or to receive any distribution to which his Transferor was entitled (to the extent Transferred), (iii) be entitled to participate in the management and affairs of the Company (including voting), or (iv) be entitled to exercise any rights of a Member (including obtaining financial information as to the Company).

10. **Mandatory Repurchases of Units.**

(a) Repurchase upon Death or Disability. Upon the occurrence of a Member's death or Total Disability (the "Event"), such Member (the "Affected Member") or his legal representative, as the case may be, shall sell, at the Company's discretion to permit a transfer of only the economic benefit of such Affected Member's Units (Permitted Transferee, hereinafter defined), and the Company shall buy, all, but not less than all, of the Units owned by such Affected Member for a purchase price determined pursuant to Section 10 (b).

Any transfer permitted by the Company for the transfer of only the economic benefit of such Affected Member's Units pursuant to this Section 10 (a) shall be referred to as a "Permitted Transfer" and any person with respect to whom units in the Company may be transferred shall be referred to as a "Permitted Transferee."

Unless and until the Company and Affected Member agree otherwise in writing, such Permitted Transferee's units (or interest in the Company) shall:

(i) Be strictly limited to the transferor's rights to the economic benefit of allocations and distributions with respect to the transferred units;

(ii) Notwithstanding any other provision of this Agreement, have no right to vote and such former Member's consent shall not be required in any matter requiring vote or consent by the Member; and

(iii) Have no right to otherwise participate in the management of the Company.

(b) Purchase Price. The purchase price of Units pursuant to this Section 10 shall be the most recently effective Current Fair Value provided for in this Agreement. Appropriate adjustment in the purchase price per Unit shall be made for any distributions, divisions of Units, or issuances by the Company of additional outstanding Units occurring after the effectiveness of the most recent determination of Current Fair Value.

Page 13 of 18

Initials

(c) <u>Payment; Subsequent Death</u>. Upon a sale of Units due to a Member's death or Total Disability, the purchase price shall be paid to the Affected Member, at the Company's sole discretion, (A) in cash at the Closing or (B) partially in cash with the balance of the purchase price payable to the Affected Member be paid by the Company in **ninety-six (96)** equal monthly installments commencing with the last day of the month following (A) the occurrence of a Member's Total Disability, or (B) the month in which the Member's personal representative is appointed, as applicable.

The obligation so to pay the balance of the purchase price pursuant to this Section shall be evidenced by a promissory note of the Company payable to the order of the Affected Member or his estate or personal representative, as applicable, bearing interest payable monthly at a rate per annum equal to **five percent (5%) interest** per annum. Such note shall provide for acceleration of the due date in the event of default in payment of any installment and shall give the maker the option of prepayment without premium or penalty in whole at any time or in part from time to time.

If an Affected Member should die after the sale of his Units due to his Total Disability, but before receipt of all the installments specified in this Section (if the purchase price is not paid in full in cash at the Closing), such Member's personal representative may, by written notice delivered to the Company, require the Company to continue installment payments as specified hereinabove to such Member's personal representative.

(d) <u>Closing</u>. At the Closing, Company shall deliver the consideration required by this Section 10, and the Affected Member or his legal representative, as the case may be, shall deliver the Units owned by the Member, duly endorsed for transfer. In the event of the death of a Member, the transfer of all of the Units owned by such Member shall transfer within sixty (60) calendar days after the appointment of his personal representative.

In the event of Member's Total Disability, the Closing of the purchase shall be held on the date on which the first installment of the purchase price is payable pursuant to this Section. The Closing of the purchase in any such case shall be held at the time and place and on the date specified by the Company by written notice to the Affected Member or his legal representative, which date shall not be later than sixty (60) calendar days after the Affected Member becomes disabled.

(e) <u>Inability of the Company to Purchase</u>. If the Company shall be unable to purchase all of the Affected Member's Units as required by Section 10(a), it shall be obligated to purchase all of the Units that it can lawfully purchase and shall immediately notify each Member and the personal representative, if any, of the Affected Member situation and of the number of Units that it cannot purchase. The remaining Members shall have an option to purchase all, but not less than all, of the Units that the Company is unable to purchase, at the same optional prices and terms as were available to the Company, exercisable by giving notice to the Company and the Affected Member or his personal representative, if any, within thirty (30) days after the Company has given notice of its inability to purchase all of the available Units. If the total number of Units that all accepting Members desire to purchase exceeds the number of available Units, each accepting Member shall have priority, up to the number of Units set forth in his written notice, to purchase that fraction of available Units in which the numerator is the number of Units owned by the accepting Member and the denominator is the number of Units owned by all accepting Members. The portion of the available Units not purchased on such a priority basis shall be allocated to those Members who have indicated in their written notices that they desire to purchase more than the number of Units to which they have a priority right, with the allocation

Page 14 of 18

Initials

determined by that fraction the numerator of which is the number of shares owned by each accepting Member and the denominator of which is the number of shares owned by all accepting Members. If the remaining Members do not elect to purchase all of the Units that the Company is unable to purchase, then the Company shall purchase all of the Units that it is legally permitted to purchase, and the Closing shall be held as soon as practicable. If the remaining Members elect to purchase all of the Units that the Company is unable to purchase, then the Closing of the purchase by the Company and the purchase by the remaining Members shall be held simultaneously at the earliest convenience of the Company, the purchasing Members and the selling Member (Affected Member) or the deceased Member's personal representative, as the case may be.

(f) <u>Certain Definitions</u>. The following terms have the meanings specified below for all purposes under this Agreement:

"<u>Current Fair Value</u>" means (i) the value as mutually agreed upon by the non-selling Member(s) and the selling Member; or (ii) if a mutually agreed upon value cannot be determined, **Three Thousand Four Hundred and No/100 Dollars ($3,400.00)** per Unit, provided that the Company and the Members will, diligently and in good faith, review the Current Fair Value at intervals of not more than **twelve (12) months**, and if, at any time and from time to time, an Unanimous Interest agrees that the Current Fair Value should be changed, the Current Fair Value shall be changed and reflected in a writing signed by a Unanimous Interest, which writing shall constitute an amendment to this Agreement and shall set forth the new Current Fair Value and the date on which the new Current Fair Value is to be effective; or (iii) if the Non-selling Member and the selling Member are unable to reach agreement on the price and the members have been unable to agree by Unanimous Interest vote within twenty-nine (29) days of the Event, the Current Fair Market Value of the Units to be sold shall be determined by an appointed single appraiser. The appraiser shall be a disinterested person and the selection of the appraiser shall be agreed upon by the parties. Such appraiser shall perform the appraisal and render a written report within thirty (30) days of such appraiser's appointment, and such determination of the price shall be binding upon the parties. The parties shall share equally in the cost of such appraiser.

"<u>Total Disability</u>" means (i) that a Member is disabled pursuant to the terms of any long term disability insurance policy which the Company has purchased and which covers such Member, or (ii) if the Company does not have any such policy, that a Member is unable to perform substantially all of his current duties as required under this Agreement or any agreement of employment with the Company for a continuous period of One Hundred Eighty (180) days because of mental or physical condition, illness or injury, as determined in the reasonable, good faith opinion of a reputable, independent, duly licensed physician (a "Deciding Physician") selected jointly by such Member and the other Members, provided, that if they are unable to agree within fifteen (15) days on such a physician, such Member, on the one hand, and the other Members, on the other hand, shall each select a duly licensed physician and those two physicians shall jointly select a Deciding Physician who shall make the determination of Total Disability.

11. **Dissolution**.

(a) <u>Generally</u>. The Company will be dissolved and its affairs wound up only upon:

(i) the approval of the Members; or

Page 15 of 18

Initials

(ii) the entry of a decree of judicial dissolution.

(b) <u>Liquidation Procedures</u>. Upon the dissolution of the Company, the Company will be liquidated in accordance with the following procedures:

(i) <u>Winding Up</u>. During the period of such dissolution and liquidation, the Members will conduct the business and affairs of the Company so as to maintain and preserve the assets of the Company in a manner consistent with the winding up of its affairs.

(ii) <u>Form of Distributions</u>. The Members will determine whether the liquidating distributions will be entirely in cash or in whole or in part a distribution of the Company's assets in kind.

(iii) <u>Priority of Payments and Distributions</u>. The assets of the Company will be distributed in the following order of priority:

(A) <u>First</u>: The Company will pay the Company's creditors in accordance with their respective priorities.

(B) <u>Second</u>: The Company will set up any reserves which the Members deem to be reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, and the amount of such reserves may be paid to a bank or trust company, as escrow agent, to be held for the purpose of disbursing such reserves in payment of such contingencies, and at the expiration of such period as the Members deem advisable, the balance will be distributed as provided in this Section 11.

(C) <u>Third</u>: The Company will distribute all remaining assets or proceeds to the Members in accordance with, and to the extent of, the Members' respective positive Capital Account balances.

(D) <u>Fourth</u>. The Company will distribute any remaining assets or proceeds to the Members in accordance with their respective Percentage Interests.

12. **Miscellaneous**.

(a) <u>Amendments</u>. **Any amendment to this Agreement** will be made in writing and signed by a **Supermajority Interest**.

(b) <u>Assignment; Binding Nature</u>. No rights under this Agreement may be assigned except to a person who becomes a Member in accordance with this Agreement. This Agreement is binding upon the parties and their respective legal representatives, trustees, executors, administrators, heirs, devisees, legatees, beneficiaries or other successors and assigns and inures to the benefit of the parties and their respective legal representatives, trustees, executors, administrators, heirs, devisees, legatees, beneficiaries or other permitted successors and assigns, if any.

(c) <u>Notices</u>. Except as otherwise provided in Section 5(c)(iv), each notice, communication and delivery under this Agreement: (i) will be made in writing signed by the party making it; (ii) will specify the Section to which it relates; (iii) will be delivered (A) in person, (B) by nationally recognized next business day delivery service for next business day

Initials

delivery, or (C) by fax; (iv) unless given in person, will be given to the address specified below; and (v) will be deemed given (A) if delivered in person, on the date delivered, (B) if sent by nationally recognized next business day delivery service, on the first business day after so sent, or (C) if sent by fax upon confirmation of transmission.  The addresses and requirements for copies are as follows:

| | | |
|---|---|---|
| <u>If to K. Phillips, TTEE to:</u><br>Kara L. Phillips, TTEE<br>10601 Stafford Rd.<br>Chagrin Falls, OH 44023 | <u>If to P. Phillips to:</u><br>Paxton Phillips<br>10601 Stafford Rd.<br>Chagrin Falls, OH 44023 | <u>If to E. Phillips to:</u><br>Ever Phillips<br>10601 Stafford Rd.<br>Chagrin Falls, OH 44023 |
| <u>If to K. Phillips to:</u><br>Kyler Phillips<br>10601 Stafford Rd.<br>Chagrin Falls, OH 44023 | <u>If to O. Phillips to:</u><br>Onyx Phillips<br>10601 Stafford Rd.<br>Chagrin Falls, OH 44023 | |

Such notice will be given to such other representatives or at such other addresses as a party may furnish to the other parties pursuant to the foregoing.  If notice is given pursuant to this Section 12(c) of a representative, trustee, executor, successor or assign of a party, then notice will thereafter be given as set forth above also to such representative, trustee, executor, successor or assign of such party.

(d)  <u>Certain Defined Terms and Rules of Construction</u>.  For purposes of this Agreement (i) "<u>affiliate</u>", when used with respect to a specified person means a person that (A) is a shareholder, partner, member, trustee, beneficiary, director or officer of such specified person or of any person specified in clause (C) hereof, (B) a person's spouse or lineal antecedent or descendant (including any by adoption) or (C) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person; (ii) "<u>control</u>" (and any derivative thereof) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; (iii) "<u>party</u>" and "<u>parties</u>" and variations of such means each or all, as appropriate, of the persons who have executed and delivered this Agreement; and each such term and variations of them, and when appropriate to effect the binding nature of this Agreement for the benefit of another party, any other successor or assign of such a party; (iv) "<u>person</u>" means any individual, sole proprietorship, partnership, corporation, joint venture, limited liability company, estate, trust, unincorporated organization, association, institution, or other entity or governmental authority; (v) "<u>this Agreement</u>" includes any amendments or other modifications and supplements, and all exhibits and other attachments, to it; (vi) "<u>including</u>" shall be deemed to be followed by the words "without limitation"; (vii) headings in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any of its provisions; (viii) whenever the context so requires, the singular includes the plural and the plural includes the singular, and the gender of any pronoun includes the other genders; (ix) any reference to any statutory provision includes each successor provision; and (x) acknowledging that the parties have participated jointly in the negotiation and drafting of this Agreement, if an ambiguity or question of intent or interpretation arises as to any aspect of this Agreement, then it will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

Page 17 of 18                                                                   *K*  *pax*  *Kr*  *ever*  *oyx*
                                                                                              Initials

(e) <u>Integration; Waiver</u>. This Agreement: (i) constitutes the entire agreement of the parties with respect to its subject matter; and (ii) supersedes all prior agreements, if any, of the parties with respect to its subject matter. The failure of any party at any time or times to require the performance of any provisions of this Agreement will in no manner affect the right to enforce the same; and no waiver by any party of any provision (or of a breach of any provision) of this Agreement, whether by conduct or otherwise, in any one or more instances, will be deemed or construed either as a further or continuing waiver of any such provision or breach or as a waiver of any other provision (or of a breach of any other provision) of this Agreement.

(f) <u>Controlling Law</u>. This Agreement, the legal relations between and among the parties and the adjudication and the enforcement thereof shall be governed by and interpreted and construed in accordance with the laws of the State of Ohio applicable to contracts formed and to be performed entirely within the State of Ohio, without regard to the conflicts of law provisions thereof to the extent such principles or rules would require or permit the application of the laws of another jurisdiction.

(g) <u>Copies</u>. This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, and it will not be necessary in making proof of this Agreement or its terms to produce or account for more than one of such counterparts. This Agreement may be executed by each party upon a separate copy and one or more execution pages may be attached from one copy of this Agreement and attached to another copy in order to form one or more counterparts. A facsimile signature shall for all purposes under this Agreement be deemed an original signature.

DULY EXECUTED and delivered by the parties on ___1 - 27 -___, 2018.

_____
KARA L. PHILLIPS, TTEE OF THE
KARA PHILLIPS REVOCABLE TRUST,
DATED JANUARY 23, 2018

_____
PAXTON PHILLIPS

_____
KYLER PHILLIPS

_____
EVER PHILLIPS

_____
ONYX PHILLIPS

Page 18 of 18

_____
Initials